**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **P10 INDUSTRIES, INC.** | § | **Case No. 17-50635-CAG** |
| | § | |
| | § | |
| **Debtor.** | § | |

---

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE PREPACKAGED PLAN OF REORGANIZATION FOR P10 INDUSTRIES, INC. UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

P10 INDUSTRIES, INC. (THE "DEBTOR") IS SENDING YOU THIS DOCUMENT AND THE ACCOMPANYING MATERIALS (THE "DISCLOSURE STATEMENT") BECAUSE YOU MAY BE A CREDITOR OR INTEREST HOLDER REGARDING THE PREPACKAGED PLAN OF REORGANIZATION FOR P10 INDUSTRIES, INC. UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE, AS THE SAME MAY BE AMENDED FROM TIME TO TIME (THE "PREPACKAGED PLAN").

THE DEBTOR HAS FILED THE VOLUNTARY CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO IMPLEMENT THE PREPACKAGED PLAN (THE "CHAPTER 11 CASE"). THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF BANKRUPTCY CODE § 1125(A).

THE DEBTOR CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT THAT IS ULTIMATELY APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASE (A) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST (I) TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PREPACKAGED PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO OBJECT TO THE PLAN.

IF THE PREPACKAGED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR WILL BE BOUND BY THE TERMS OF THE

**DATED:  March 22, 2017**　　　　　　**ERIC TERRY LAW, PLLC**
Eric Terry
Texas Bar No. 00794729
4040 Broadway Street
Suite 350
San Antonio, Texas 78209
Telephone:　　(210) 468-8274
Facsimile:　　(210) 319-5447
eric@ericterrylaw.com

**PROPOSED ATTORNEY FOR
THE DEBTOR-IN-POSSESSION**

# TABLE OF CONTENTS

**Page**

ARTICLE I Introduction.............................................................................................. 6
   A. Summary of Plan............................................................................................ 6
   B. Filing of the Chapter 11 Cases..................................................................... 7
   C. Purpose of Disclosure Statement ................................................................. 7
   D. Hearing on Confirmation of the Prepackaged Plan .................................... 8
   E. Sources of Information .................................................................................. 8

ARTICLE II Explanation of Chapter 11 ..................................................................... 9
   A. Overview of Chapter 11 ................................................................................ 9
   B. Plan of Reorganization.................................................................................. 9

ARTICLE III Solicitation and Voting Procedures..................................................... 10
   A. Classes Entitled to Vote .............................................................................. 10
   B. Confirmation of Plan................................................................................... 11

ARTICLE IV Background of the Debtor..................................................................... 12
   A. The Debtor's Business and Operations....................................................... 12
   B. Current Assets and Capital Structure.......................................................... 14
      1. Assets.................................................................................................... 15
      2. Liabilities ............................................................................................. 15

ARTICLE V Events Leading to Bankruptcy ............................................................. 15
   A. Bankruptcy Counsel.................................................................................... 15
   B. 210 RSA...................................................................................................... 15
   C. Langley RSA............................................................................................... 16

ARTICLE VI Description of the Prepackaged Plan ................................................... 16
   A. Introduction................................................................................................. 16
   B. Classification of Claims and Interests......................................................... 16
   C. Identification of Classes............................................................................... 16
   D. Unimpaired Classes ..................................................................................... 17
   E. Impaired, Voting Classes ............................................................................. 17
   F. Impaired, Non-Voting Classes..................................................................... 17
   G. Treatment of Classes.................................................................................... 17
      1. Treatment of Class 1 - Allowed Secured Non-Tax Claims ................. 17
      2. Treatment of Class 2 - Allowed Secured Tax Claims.......................... 18
      3. Treatment of Class 3 - Allowed Priority Non-Tax Claims ................. 18
      4. Treatment of Class 4 - Allowed General Unsecured Claims............... 19
      5. Treatment of Class 5- Interests ........................................................... 19
   H. Special Provision Governing Unimpaired Claims and Interests.................. 20

ARTICLE VII Means for Execution and Implementation of the Prepackaged Plan.................... 20
   A. Legally Binding Effect................................................................................. 20
   B. Vesting of Property in the Reorganized Debtor........................................... 20
   C. Operations Between the Confirmation Date and Effective Date ................. 20
   D. Corporate Action......................................................................................... 20

 E. Governance Documents and Corporate Existence...........................................................21
 F. Restructuring Transactions ..............................................................................................21
 G. Sources of Cash for Prepackaged Plan Distributions .....................................................22
 H. Directors and Officers of the Reorganized Debtor .........................................................22
 I. Disclosure of Directors and Officers ..............................................................................23
 J. D&O Liability Insurance Policies....................................................................................23
 K. New Indemnification Agreements ...................................................................................23
 L. Derivative Litigation Claims...........................................................................................23

ARTICLE VIII Treatment of Executory Contracts and Unexpired Leases...................................24
 A. Assumption and Rejection of Executory Contracts and Unexpired Leases ....................24
  1. Assumed Executory Contracts and Unexpired Leases ............................................24
  2. Assumption and Assignment of the Braker Facility Lease......................................24
  3. Rejection of Certain Executory Contracts and Unexpired Leases............................24
 B. Proposed Cure Claim Amounts .......................................................................................24
  1. Objections to Proposed Cure Claim Amounts ........................................................25
  2. Failure to Object to a Proposed Cure Claim Amount..............................................25
  3. Resolution of Objection to Proposed Cure Claim Amount .....................................25
  4. Deemed Assumption Subject to Revocation...........................................................25
  5. Payment of Cure Claims .........................................................................................25
 C. Rejection Damages Bar Date ...........................................................................................26
 D. Reservation of Rights.......................................................................................................26
 E. Dispute Regarding Executory Nature of Contracts .........................................................26
 F. Post-Petition Contracts and Leases .................................................................................26

ARTICLE IX Settlement, Release, Injunction and Related Provisions........................................26
 A. Comprehensive Settlement of Claims and Controversies................................................26
 B. Settlement of Claims with Legacy Purchaser .................................................................27
 C. Settlement of Claims with Mark Ascolese ......................................................................27
 D. Settlement of Claims with Jay Powers.............................................................................27
 E. Indemnities......................................................................................................................27
 F. Exculpation .....................................................................................................................28
 G. Release of Protected Parties.............................................................................................28
 H. 210 Release .....................................................................................................................28
 I. Discharge and Discharge Injunction ...............................................................................29
 J. Enjoining Holders of Claims Against and Interests in Debtor ........................................29
 K. Integral to the Plan ..........................................................................................................30

ARTICLE X Retention of Rights of Action .................................................................................30
 A. Reorganized Debtor's Preservation, Retention and Maintenance of Rights of Action ....30
 B. Preservation of All Rights of Action Not Expressly Settled or Released........................30

ARTICLE XI Financial Projections, Feasibility and Risks ..........................................................31
 A. Financial Projections and Feasibility ..............................................................................31
 B. Risks Associated with the Plan .......................................................................................31
 C. Other Risks Related to the Debtor's and Reorganized Debtor's Business ......................32

ARTICLE XII Alternatives to Plan and Liquidation Analysis .....................................................32
 A. Dismissal.........................................................................................................................32

   B.  Chapter 7 Liquidation ...................................................................................... 32

   C.  Alternative Plan .............................................................................................. 33

ARTICLE XIII Certain United States Federal Income Tax  Consequences of the Prepackaged Plan ............................................................................................................................. 34

   A.  Federal Income Tax Consequences to Debtors................................................ 34

   B.  Federal Income Tax Cosequences to Creditors .............................................. 35

      1.  In General.................................................................................................. 35

      2.  Backup Withholding and Information Reporting ...................................... 35

   C.  Federal Income Tax Consequences to Interest Holders................................... 36

ARTICLE XIV Conclusion ................................................................................................. 36

## List of Exhibits

Prepackaged Plan of Reorganization for P10 Industries, Inc. Under Chapter 11 of the United States Bankruptcy Code ...................................................................................................Exhibit 1

210 Restructuring Support Agreement ..........................................................................Exhibit 2

Langley Restructuring Support Agreement ....................................................................Exhibit 3

10-K ...............................................................................................................................Exhibit 4

List of Patents ................................................................................................................Exhibit 5

## ARTICLE I
## Introduction

P10 Industries, Inc., a Delaware corporation formerly known as Active Power Inc. (the "Debtor"), debtor-in-possession in the Chapter 11 Case, respectfully submits this *Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Prepackaged Plan of Reorganization for P10 Industries, Inc. under Chapter 11 of the United States Bankruptcy Code* (as it may be amended, supplemented or modified from time to time (the "Disclosure Statement"). A copy of the Prepackaged Plan is attached to this Disclosure Statement as **Exhibit 1**.

This Disclosure Statement[1] sets forth certain information regarding the prepetition operations and financial history of the Debtor, events leading to the Debtor's bankruptcy, and the means for implementing a restructuring of the Debtor's financial affairs. This Disclosure Statement also describes terms and provisions of the Prepackaged Plan, including certain alternatives to the Prepackaged Plan, certain effects of confirmation of the Prepackaged Plan, certain risk factors associated with the Prepackaged Plan, and the manner in which distributions will be made under the Prepackaged Plan. Additionally, this Disclosure Statement discusses the confirmation process for the Prepackaged Plan.

### A.    Summary of Plan

The Prepackaged Plan effectuates the terms of two Restructuring Support Agreements, copies of which are attached hereto as **Exhibits 2 and 3**, that will allow the Reorganized Debtor (i) to obtain an investment of $4,654,750 million, which will allow the Reorganized Debtor to monetize the Reorganized Debtor's patents, make profitable acquisitions, run the Debtor's business and fund necessary capital expenditures all to maximize shareholder return (ii) eliminate significant lease and other liabilities (iii) pay all Administrative, Secured, Priority and General Unsecured Claims in full; and (iv) allow equity to retain its interests.

---

[1]  Except as otherwise provided in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Prepackaged Plan, including the Glossary of Defined Terms attached to the Plan as Exhibit A. Any capitalized term used in this Disclosure Statement that is not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

**B.     Filing of the Chapter 11 Cases**

The Debtor has filed a Chapter 11 Case in the Bankruptcy Court.  The Debtor intends to continue to operate its business and manage its property and assets as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

**C.     Purpose of Disclosure Statement**

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for soliciting acceptances of the Prepackaged Plan from Holders of certain Classes of Claims and Interests under Bankruptcy Code § 1126(b).  Acceptances of the Prepackaged Plan are being sought only from Holders of Claims whose Claims are Impaired by the Prepackaged Plan and who are receiving or retaining property under the Prepackaged Plan.  Holders of Claims or Interests that are not Impaired are deemed to have accepted the Prepackaged Plan.  ALL OF THE HOLDERS OF CLAIMS AND INTERESTS ARE UNIMPAIRED, AND THEREFORE, NOT ENTITLED TO VOTE AND DEEMED TO HAVE ACCEPTED THE PREPACKAGED PLAN.

The Debtor submits that the Disclosure Statement complies with all applicable nonbankruptcy law and provides adequate information as defined in Bankruptcy Code § 1125(a).

**THE MATERIAL CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED SOLELY FOR THE USE OF HOLDERS OF CLAIMS AND INTERESTS IN EVALUATING THE PREPACKAGED PLAN, ACCORDINGLY, MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF WHETHER TO OBJECT TO, THE PREPACKAGED PLAN.  THE REORGANIZATION OF THE DEBTOR PURSUANT TO THE PREPACKAGED PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ASSURANCE THAT THE PREPACKAGED PLAN, AS CONTEMPLATED, WILL BE EFFECTUATED.**

**THE DEBTOR BELIEVES THAT THE PREPACKAGED PLAN AND THE PROPOSED TREATMENT OF CLAIMS AND INTERESTS IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS IT PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THE PREPACKAGED PLAN SHOULD BE REVIEWED CAREFULLY.**

**NEITHER THE FILING OF THE PREPACKAGED PLAN NOR ANY STATEMENT OR PROVISION CONTAINED IN THE PREEPACKAGED PLAN OR IN THE DISCLOSURE STATEMENT, NOR THE TAKING BY ANY PARTY IN INTEREST OF ANY ACTION WITH RESPECT TO THE PREPACKAGED PLAN, SHALL (i) BE OR BE DEEMED TO BE AN**

**ADMISSION AGAINST INTEREST AND (ii) UNTIL THE EFFECTIVE DATE, BE OR BE DEEMED TO BE A WAIVER OF ANY RIGHTS ANY PARTY IN INTEREST MAY HAVE (a) AGAINST ANY OTHER PARTY IN INTEREST OR (b) IN ANY OF THE ASSETS OF ANY OTHER PARTY IN INTEREST, AND, UNTIL THE EFFECTIVE DATE, ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED. IN THE EVENT THAT THE PREPACKAGED PLAN IS NOT CONFIRMED OR FAILS TO BECOME EFFECTIVE, NEITHER THE PREPACKAGED PLAN NOR THE DISCLOSURE STATEMENT, NOR ANY STATEMENT CONTAINED IN THE PREPACKAGED PLAN OR IN THE DISCLOSURE STATEMENT, MAY BE USED OR RELIED ON IN ANY MANNER IN ANY SUIT, ACTION, PROCEEDING OR CONTROVERSY, WITHIN OR WITHOUT THE DEBTORS' BANKRUPTCY CASE, INVOLVING THE DEBTOR, EXCEPT WITH RESPECT TO CONFIRMATION OF THE PREPACKAGED PLAN.**

**D.      Hearing on Confirmation of the Prepackaged Plan**

The Debtor will ask the Bankruptcy Court to set a date for the Confirmation Hearing to determine whether the requirements for confirmation of the Prepackaged Plan have been satisfied within thirty (30) days of the Petition Date.

**E.      Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, properties and management have been prepared from information furnished by the Debtor or from public filings made by the Debtor.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, it urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Interest under the Prepackaged Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Debtor, Eric B.

Terry, Eric Terry Law, PLLC, 4040 Broadway, Suite 350, San Antonio, Texas 78209; Telephone (210) 468-8274, or eric@ericterrylaw.com.

# ARTICLE II
## Explanation of Chapter 11

### A.      Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.   Under Chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other interested parties.

The commencement of a Chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed.  Unless the Bankruptcy Court orders the appointment of a trustee, Bankruptcy Code §§ 1101, 1107 and 1108 provide that a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession."

The filing of a Chapter 11 petition also triggers the automatic stay under Bankruptcy Code § 362.  The automatic stay halts essentially all attempts to collect prepetition claims from the debtor or otherwise to interfere with the debtor's business or its bankruptcy estate.

Formulation of a plan of reorganization/liquidation is the principal purpose of a Chapter 11 case.  The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor.  Unless the Bankruptcy Court shortens the time period or a trustee is appointed, only the debtor may file a plan during the first 120 days of a Chapter 11 case (the "Exclusive Period").  After the Exclusive Period has expired, a creditor or any other interested party may file a plan, unless the debtor files a plan within the Exclusive Period.

### B.      Plan of Reorganization

After a plan has been filed, the holders of claims against, or equity interests in, a debtor are permitted to vote on whether to accept or reject the plan.  Chapter 11 of the Bankruptcy Code does not require that each holder of a claim against, or equity interest in, a debtor vote in favor of a plan in order for the plan to be confirmed.  At a minimum, however, if there is an impaired class, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan.  The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and therefore are not entitled to vote.  A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or equity interests of that class.  Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Conversely, classes of claims or equity interests that receive or retain no property under a plan of

reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and equity interests accept a plan of reorganization, the Bankruptcy Court may nonetheless deny confirmation. Bankruptcy Code § 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interestholders and that the plan be "feasible." The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than that which those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept it. The Court may do so under the "cramdown" provisions of Bankruptcy Code § 1129(b). In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or equity interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code § 1129(b) with respect to the subject objecting class. If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code § 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code § 1129(a) (except § 1129(a)(8)). Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) the plan be proposed in good faith, and (iii) at least one impaired class of creditors or interestholders has voted to accept the plan.

## ARTICLE III
## Solicitation and Voting Procedures

The following summarizes the procedures to accept or reject the Prepackaged Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

## A. Classes Entitled to Vote

Those Holders of Claims and Interests whose Claims or Interests are Unimpaired under the Plan are conclusively presumed to have accepted the Prepackaged Plan under Bankruptcy Code § 1126(f), and therefore need not vote with regard to the Prepackaged Plan. Under Bankruptcy Code § 1126(g), Holders of Claims or Interests who do not either receive or retain any property under the Prepackaged Plan are deemed to have rejected the Plan, and therefore need not vote with regard to the Prepackaged Plan. ALL OF THE HOLDERS OF CLAIMS

AND INTERESTS ARE UNIMPAIRED, AND THEREFORE, NOT ENTITLED TO VOTE AND DEEMED TO HAVE ACCEPTED THE PREPACKAGED PLAN.

## B.    Confirmation of Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code § 1129 have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Prepackaged Plan.  For the Prepackaged Plan to be confirmed, Bankruptcy Code § 1129 requires that:

(a)    The Prepackaged Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)    The Prepackaged Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment or distribution made or promised by the Debtor or by a Person issuing securities or acquiring property under the Prepackaged Plan for services or for costs and expense in connection with the Prepackaged Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Prepackaged Plan is reasonable, or if such payment is to be fixed after confirmation of the Prepackaged Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed or will disclose the identity and affiliation of any individual proposed to serve, after confirmation of the Prepackaged Plan, as a director, officer or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Prepackaged Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and interestholders and with public policy; and the Debtor has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such Insider;

(f)    Any government regulatory commission with jurisdiction (after confirmation of the Prepackaged Plan) over the rates of the Debtor has approved any rate change provided for in the Prepackaged Plan, or such rate change is expressly conditioned on such approval;

(g)    With respect to each Impaired Class of Claims or Interests, either each holder of a Claim or Interest of the Class has accepted the Prepackaged Plan, or will receive or retain under the Prepackaged Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Prepackaged Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.  If

Bankruptcy Code § 1111(b)(2) applies to the Claims of a Class, each Holder of a Claim of that Class will receive or retain under the Prepackaged Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that Holder's interest in the Debtor's interest in the property that secures that Claim;

(h)     Each Class of Claims or Interests has either accepted the Prepackaged Plan or is not Impaired under the Prepackaged Plan;

(i)     Except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to a different treatment of its Claim, the Prepackaged Plan provides that Administrative Claims and Allowed Priority Unsecured Non-Tax Claims shall be paid in full on the Effective Date or the Allowance Date;

(j)     If a Class of Claims or Interests is Impaired under the Prepackaged Plan, at least one such Class of Claims or Interests has accepted the Prepackaged Plan, determined without including any acceptance of the Prepackaged Plan by any Insider holding a Claim or Interest of that Class; and

(k)     Confirmation of the Prepackaged Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Prepackaged Plan, unless such liquidation or reorganization is proposed in the Prepackaged Plan.

The Debtor believes that the Prepackaged Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Prepackaged Plan was proposed in good faith. The Debtor believes it has complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Prepackaged Plan.

## ARTICLE IV
## Background of the Debtor

### A.     The Debtor's Business and Operations

On September 29, 2016, the Debtor entered into an Asset Purchase Agreement with Langley Holdings plc, a United Kingdom public limited company, and Piller USA, Inc. (now Piller Power Systems, Inc.) ("Piller"), a Delaware corporation and a wholly owned subsidiary of Langley. Langley and its subsidiaries, including Piller are collectively referred to herein as "Langley." The agreement provided, among other things, that Langley would purchase from the Debtor substantially all of its assets and operations for a nominal purchase price plus the assumption of all of the Debtor's indebtedness, including bank debt, liabilities and customer, employee and purchase commitments going forward. For further information see the Debtor's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "10-K") attached hereto as **Exhibit 4**.

On November 19, 2016, the Debtor completed the sale of substantially all of its assets and operations to Langley. Pursuant to the terms of the purchase agreement, after the closing of the disposition of our assets, the Debtor retained approximately $1.6 million in cash, which

equaled the amount by which the value of the acquired assets exceeded the assumed liabilities on the Debtor's balance sheet by more than $5 million at closing. The Debtor also retained certain intellectual property rights related to certain of patents. Following the sale of our assets to Langley, the Debtor changed its name from Active Power, Inc. to P10 Industries, Inc.

On December 1, 2016, the Debtor filed with the SEC a Notification of Removal from Listing and/or Registration under Section 12(b) of the Exchange Act on Form 25 to delist the shares of the Debtor's common stock from NASDAQ and to deregister the Debtor's common stock under Section 12(b) of the Exchange Act. On that day, the Debtor's common stock was suspended on NASDAQ and, since that date, the Debtor's common stock has been traded solely on the OTC Pink Market operated by OTC Markets Group. On January 5, 2017, the Debtor filed a Certification and Notice of Termination of Registration under Section 12(g) of the Exchange Act on Form 15. On March 15, 2017, the Debtor filed with the SEC a Certification and Notice of Suspension of Duty to File Reports under Sections 13 and 15(d) of the Exchange Act on Form 15, which suspended the filing of current and periodic reports with the SEC under the Exchange Act. The Debtor's common stock currently trades on the OTC Pink Market under the symbol PIOI.

The Debtor has spent decades building up its intellectual property portfolio, spending tens of millions of dollars on research and development targeting a variety of leading edge technologies with applications beyond traditional uninterrupted power supply (UPS) and flywheel technology. With the asset sale, a majority of patents directly related to the flywheel business were transferred to Langley. Importantly, the Debtor was able to retain 18 US patents and 3 foreign patents ("Patents"), which the Debtor believes have the potential to create material value for the Debtor's stakeholders. A list of Patents attached hereto as **Exhibit 5**.

In the fall of 2016, a study was conducted on the Patents by patent expert Jack Lu, PhD, CFA, the Founding Partner and Chief Economist of Intellectual Property Market Advisory Partners LLC. Dr. Lu concluded, through extensive analysis, that the most likely valuation of the Patents (not including the foreign patents), was in excess of $3.5 million. As is typical in patent analysis, there were plenty of caveats, which could make the patent valuation either materially higher, or lower. Importantly, however, Dr. Lu concluded that the Patents covered technology that can be adopted in a wide range of fields of use, including industrial and commercial building, process control and automation, and certain areas of manufacturing.

Since the study conducted by Dr. Lu, the Debtor has engaged Novelty Capital LLC ("Novelty") to assist the Debtor in pursuing a targeted plan to monetize the intellectual property covered by the Patents. The Debtor and Novelty have agreed upon a multi-phase plan that involves 1) reviewing technology related to the Patents to determine evidence of use; 2) preparing detailed claim charts, conducting validity and financial analysis to determine fair market values for the Patents; 3) preparing a monetization plan for the Patents, including potential sale or licensing; 4) searching for, identifying and sourcing potential patent sale and licensing opportunities; and 5) structuring each individual patent transaction.

The Debtor and Novelty expect this process to take time. Initial progress has been encouraging, with early phases of the plan already complete. Going forward, the Debtor intends to vigorously continue pursuing the business plan of maximizing the value of its intellectual

property. The Debtor believes the ultimate value for the Debtor's stakeholders could be material. Moreover, given the nature of the intangible assets involved, the Debtor and Novelty intend to be thoughtful in their approach. The optimal path for monetization may differ for each patent: for some, a sale may be optimal; for others, licensing may generate the highest net present value; and for others, a contribution to a joint venture with other "related patent" holders may make the most economic sense for the Debtor's stakeholders. The Debtor intends to fully explore every option in pursuit of a detailed and nuanced plan that seeks to maximize value for its stakeholders.

In connection with monetizing the Patents, the Debtor is also pursuing a strategy of making acquisitions of profitable operations.

Finally, the Debtor has U.S. federal income tax net operating loss carryovers ("NOLs") of approximately $274.6 million and research and development credit carry-forwards of approximately $4.1 million, each as of December 31, 2016 ("Development Credits" and together with the NOLs, the "Tax Attributes"). The Debtor is operating its business in a manner that is intended to preserve these Tax Attributes for use in reducing future income tax liabilities.

## B.    Current Assets and Capital Structure

As discussed, the Debtor's primary assets consist of the Cash, the Patents, and the Tax Attributes. Pursuant to the Asset Purchase Agreement, Langley assumed all of the Debtor's Liabilities, as defined below, arising out of, relating to or otherwise in respect of the purchased assets to the extent Liabilities relate to such assets on or prior to the closing date but excluding each of the following: (1) Liabilities relating to the headquarters facility lease ("Braker Facility Lease"), (2) Liabilities relating to the Assignment and Assumption of Lease Agreement, dated November 19, 2016, relating to the Debtor's former facility at 11525 Stonehollow Drive, Austin, Texas ("Stonehollow Lease Assignment"), and (3) Liabilities related to taxes, indemnification of officers and directors, retained assets, retained employees or obligations to Langley under the Asset Purchase Agreement. "Liabilities" shall mean any liability, indebtedness or obligation of any kind (whether known, unknown, accrued, absolute, contingent, matured, unmatured or otherwise, and whether or not required to be recorded or reflected on a balance sheet under generally accepted accounting principles in the U.S.). For clarification, Langley agreed to partially assume the lease obligations for the Braker Facility Lease pursuant to a sublease, but the landlord refused to approve the sublease of the Braker Facility Lease to Langley, and the sublease was not executed. However, Langley agreed to close on the sale without the sublease of that facility. As a result, P10 is still obligated to make payments under the lease for our headquarters, although Langley is currently making payments to us in the same amount.

The Debtor also has unsecured debt obligations that it pays in the ordinary course. Most of the prepetition amounts related to these obligations were paid before filing. However, the Debtor will have ongoing obligations related to payroll, benefits, ordinary course professionals, and various vendors.

1.  **Assets**

The Debtor has identified their property and assets existing on the Petition Date in their *Schedules of Assets and Liabilities and Statements of Financial Affairs* (as may be amended), which are available on the Court's docket or by written request to the Debtors' counsel.

2.  **Liabilities**

The Debtor has also identified their liabilities existing on the Petition Date in the *Schedules of Assets and Liabilities and Statements of Financial Affairs* (as may be amended), which are also available on the Court's docket or by written request to the Debtor's counsel. The total amounts indicated in the *Schedules of Assets and Liabilities* may change based on subsequent amendments to the *Schedules of Assets and Liabilities*, proofs of claim filed in the Debtor's Chapter 11 Case, as well as the outcome of any objections to those proofs of claim.

### ARTICLE V
### Events Leading to Bankruptcy

Subsequent to the sale of substantially all of the Debtor's assets, the Debtor has focused their efforts on (i) preserving cash by reducing overhead expenses; (ii) negotiating with the landlord and Langley to terminate the Debtor's obligations under the Braker Facility Lease; and (iii) actively seeking financing necessary to move forward with the Debtor's strategy to monetize the Patents and make acquisitions designed to generate profit and positive cash flows, thus creating long-term stockholder value ("Strategy").

Before the Petition Date, in a vigorous effort to obtain the required financing, the Debtor had serious discussions with several potential investors. However, obtaining the necessary financing was difficult due, in large part, to the Debtor's Liabilities, including the Liabilities related to the Braker Facility Lease, which could have potentially amounted to over $5 million. Without the necessary financing, claims, liabilities and expenses such as payroll for the two executive employees, directors' and officers' insurance, taxes, legal, accounting and consulting fees and miscellaneous administrative expenses, continued to be incurred. These liabilities and expenses could be material and much higher than currently anticipated and, in any event, would have reduced or eliminated the amount of assets available for ultimate distribution to stockholders. As a result, if the Debtor could not obtain investment financing and terminate their obligations under the Braker Facility Lease, they would have had to proceed with a dissolution and distribution of all remaining assets in accordance with applicable law.

A.  **Bankruptcy Counsel**

On February 27, 2017, Debtor hired the law firm of Eric Terry Law PLLC to prepare and file this prepackaged Chapter 11 Case

B.  **210 RSA**

On March 22, 2017, the Debtor entered into a Restructuring Support Agreement ("210 RSA") with Dallas based 210/P10 Acquisition Partners, LLC ("210"). A true and correct copy of the 210 RSA is attached hereto as **Exhibit A** and incorporated herein by reference.

Pursuant to the 210 RSA, subject to the terms and conditions of a securities purchase agreement, 210 will invest $4.654 million in exchange for shares of 210's common stock representing approximately 48% of the Debtor's equity. In addition, subject to the terms and conditions of a securities purchase agreement and loan agreement, 210 will provide a ten million dollar line of credit to be used for acquisitions as the Debtor implements its Strategy. Pursuant to the 210 RSA, the Debtor was required to file bankruptcy and confirm a plan of reorganization effectuating the terms of the 210 RSA.

## C.      Langley RSA

The Debtor also entered into a Restructuring Support Agreement with Langley. ("Langley RSA"). A true and correct copy of the Langley RSA is attached hereto as **Exhibit B** and incorporated herein by reference. Pursuant to the Langley RSA, the Debtor will be able to shed all of its contingent liabilities including those related to the Braker Facility Lease.

The Debtor has filed, with its Petition and Schedules, the Prepackaged Plan and the Disclosure Statement, which, after Court approval, shall order the implementation of the terms of the 210 RSA and the Langley RSA allowing the Debtor to maximize its Strategy for the long-term benefit of its shareholders

## ARTICLE VI
### Description of the Prepackaged Plan

## A.      Introduction

A summary of the principal provisions of the Prepackaged Plan and the treatment of Classes of Allowed Claims and Allowed Interests is set out below. The summary is entirely qualified by the Prepackaged Plan. This Disclosure Statement is only a summary of the terms of the Prepackaged Plan; it is the Prepackaged Plan and not the Disclosure Statement that governs the rights and obligations of the parties.

## B.      Classification of Claims and Interests

Pursuant to Bankruptcy Code § 1122, a Claim or Interest is placed in a particular Class for purposes of voting on the Prepackaged Plan and receiving Distributions under the Prepackaged Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; (ii) the Claim or Interest is an Allowed Claim or Allowed Interest in that Class; and (iii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with Bankruptcy Code § 1123(a)(1), all Claims and Interests except Administrative Claims and Priority Tax Claims are classified in the Classes set forth below.

## C.      Identification of Classes

1.      **Class 1 - Allowed Secured Non-Tax Claims**. Class 1 shall consist of all Allowed Secured Non-Tax Claims. Each Secured Non-Tax Claim in Class 1 shall be assigned to a separate subclass.

2.      **Class 2 - Allowed Secured Tax Claims**.  Class 2 shall consist of all Allowed Secured Tax Claims.  Each Secured Tax Claim in Class 2 shall be assigned to a separate subclass.

3.      **Class 3: Allowed Priority Non-Tax Claims**.  Class 3 shall consist of all Allowed Priority Non-Tax Claims.

4.      **Class 4 - Allowed General Unsecured Claims**.  Class 4 shall consist of all Allowed General Unsecured Claims.

5.      **Class 5 - Interests**.  Class 5 shall consist of all Interests in the Debtor.

## D.      Unimpaired Classes

Classes 1, 2, 3, 4, and 5 are Unimpaired under the Prepackaged Plan.  Under Bankruptcy Code § 1126(f), Holders of Claims in Classes 1, 2, 3, and 4, and Holders of Interests in Class 5, are conclusively presumed to have accepted the Prepackaged Plan and are therefore not entitled to vote to accept or reject the Prepackaged Plan.

## E.      Impaired, Voting Classes

Under Bankruptcy Code § 1126(a), holders of claims and interests that are impaired are entitled to vote to accept or reject the Prepackaged Plan.  None of the Classes under the Prepackaged Plan are Impaired and therefore none of the Classes of Claims and Interests are entitled to vote on the Prepackaged Plan.

## F.      Impaired, Non-Voting Classes

There are not any Impaired, Non-Voting Classes under the Prepackaged Plan.

## G.      Treatment of Classes

### 1.      Treatment of Class 1 - Allowed Secured Non-Tax Claims

i.      <u>Subclasses</u>.  If there is more than one Allowed Non-Tax Secured Claim, then each Allowed Secured Non-Tax Claim shall be classified in a separate subclass (to be designated 1A, 1B, 1C, etc.).

ii.      <u>Impairment and Voting</u>.  Class 1 (and each sub-Class therein, as applicable) is Unimpaired by the Prepackaged Plan.  Each Holder of an Allowed Non-Tax Secured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively presumed to have accepted the Prepackaged Plan.

iii.      <u>Treatment</u>.  Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Secured Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date, (b) the Allowance Date, (c) the date such Allowed Secured Non-Tax

Claim becomes due and owing in the ordinary course of business, and (d) such date as is mutually agreed upon by the Debtor or the Reorganized Debtor and the Holder of such Allowed Secured Non-Tax Claim either: (a) at the sole discretion of the Debtor or the Reorganized Debtor, as applicable, (i) Cash equal to the unpaid portion of such Allowed Secured Non-Tax Claim, including any interest on such Allowed Secured Non-Tax Claim required to be paid pursuant to Bankruptcy Code § 506(b), or (ii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Secured Non-Tax Claim; or (b) such other treatment as may be agreed to by the Debtor and the Holder of such Allowed Secured Non-Tax Claim in writing.

**2.      Treatment of Class 2 - Allowed Secured Tax Claims**

i.      <u>Subclasses</u>: If there is more than one Allowed Secured Tax Claim, then each Allowed Secured Tax Claim shall be classified in a separate subclass (to be designated 2A, 2B, 2C, etc.).

ii.      <u>Impairment and Voting</u>.    Class 2 (and each sub-Class therein, as applicable) is Unimpaired by the Prepackaged Plan.  Each Holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively presumed to have accepted the Prepackaged Plan.

iii.      <u>Treatment</u>.    Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Secured Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, either: (a) at the sole discretion of the Debtor or the Reorganized Debtor (i) Cash equal to the unpaid portion of such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to Bankruptcy Code § 506(b) as soon as reasonably practicable after the later of (A) the Effective Date, (B) the Allowance Date, (C) the date such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business, and (D) such date as is mutually agreed upon by the Debtor or the Reorganized Debtor and the Holder of such Allowed Secured Tax Claim, (ii) pursuant to Bankruptcy Code § 1129(a)(9)(D), deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Secured Tax Claim, or (iii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Secured Tax Claim; or (b) such other treatment as may be agreed to by the Debtor and the Holder of such Allowed Secured Tax Claim in writing.

**3.      Treatment of Class 3 - Allowed Priority Non-Tax Claims**

i.      <u>Impairment and Voting</u>.  Class 3 is Unimpaired by the Prepackaged Plan. Each Holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively presumed to have accepted the Prepackaged Plan.

ii.	Treatment.	Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the later of (a) the Effective Date, (b) the Allowance Date, (c) the date such Allowed Priority Non-Tax Claim becomes due and owing in the ordinary course of business, and (d) such date as is mutually agreed upon by the Debtor or the Reorganized Debtor and the Holder of such Allowed Priority Non-Tax Claim either: (a) at the sole discretion of the Debtor or the Reorganized Debtor, as applicable, (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Priority Non-Tax Claim; or (b) such other treatment as may be agreed to by the Debtor and the Holder of such Allowed Priority Non-Tax Claim in writing.

## 4.	Treatment of Class 4 - Allowed General Unsecured Claims

i.	Impairment and Voting.	Class 4 is Unimpaired by the Prepackaged Plan. Each Holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively presumed to have accepted the Prepackaged Plan.

ii.	Treatment.	Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim as soon as reasonably practicable after the later of (a) the Effective Date, (b) the Allowance Date, (c) the date such Allowed General Unsecured Claim becomes due and owing in the ordinary course of business, and (d) such date as is mutually agreed upon by the Debtor or the Reorganized Debtor and the Holder of such Allowed General Unsecured Claim either: (a) at the sole discretion of the Debtor or the Reorganized Debtor, as applicable, (i) Cash equal to the unpaid portion of such Allowed General Unsecured Claim or (ii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed General Unsecured Claim; or (b) such other treatment as may be agreed to by the Debtor and the Holder of such Allowed General Unsecured Claim in writing.

## 5.	Treatment of Class 5- Interests

i.	Impairment and Voting.	Class 5 is Unimpaired by the Prepackaged Plan. Each Holder of Interests is not entitled to vote to accept or reject the Prepackaged Plan and shall be conclusively presumed to have accepted the Prepackaged Plan.

ii.	Treatment.	Unless otherwise provided for in the Prepackaged Plan or pursuant to an order of the Bankruptcy Court, on the Effective Date, Holders of Class 5 Interests shall retain their equity Interests and are Unimpaired in accordance with Bankruptcy Code § 1124.

**H.      Special Provision Governing Unimpaired Claims and Interests**

Except as otherwise provided in the Prepackaged Plan, nothing under the Prepackaged Plan will affect the Debtor's rights in respect of any Unimpaired Claims or Interests, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims or Interests, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Prepackaged Plan.

## ARTICLE VII
### Means for Execution and Implementation of the Prepackaged Plan

**A.      Legally Binding Effect**

Provisions of this Prepackaged Plan shall bind all Creditors and Interest Holders, including such Holder's respective successors and assigns, whether or not they accept the Prepackaged Plan.  On and after the Effective Date, all Creditors and Interest Holders shall be precluded and enjoined from asserting any Claim or Interest against the Debtor, the Reorganized Debtor or its assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Prepackaged Plan.

**B.      Vesting of Property in the Reorganized Debtor**

On the Effective Date, except as otherwise expressly provided in the Prepackaged Plan, title to all Estate property, including all Rights of Action, shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges or other encumbrances of any kind, except pursuant and subject to the terms and conditions of the SPA, the Loan Documents, or the SPA Ancillary Documents.  On and after the occurrence of the Effective Date, except as otherwise provided in the Prepackaged Plan, the Reorganized Debtor may operate its business and may use, acquire and dispose of its Assets free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

**C.      Operations Between the Confirmation Date and Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate its business as debtor in possession, subject to all applicable orders of the Bankruptcy Court and any limitations or agreements set forth in the 210 RSA.

**D.      Corporate Action**

The entry of the Confirmation Order shall constitute authorization for the Debtor and the Reorganized Debtor to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Prepackaged Plan, the SPA, the Loan Documents, and the SPA Ancillary Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the Holders of Interests,

officers, or directors of the Debtor or Reorganized Debtor, including, among other things: (1) the approval and effectiveness of the New Organizational Documents; (2) the issuance of the SPA Common Stock; (2) the execution and delivery of, and performance under the SPA, the Loan Documents, and the SPA Ancillary Documents and the incurrence of indebtedness and obligations thereunder; (4) all transfers of Assets that are to occur pursuant to the Prepackaged Plan; (5) the incurrence of all obligations contemplated by the Prepackaged Plan and the making of Distributions; and (6) the implementation of all settlements and compromises as set forth in or contemplated by the Prepackaged Plan.  On the Effective Date, the officers of the Debtor and the Reorganized Debtor are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Prepackaged Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor and the Reorganized Debtor, as applicable.  The authorizations and approvals contemplated by this Article V of the Prepackaged Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

E.      **Governance Documents and Corporate Existence**

Except as otherwise provided in the Prepackaged Plan, the Debtor shall continue to exist after the Effective Date as the Reorganized Debtor in accordance with the applicable laws of the jurisdiction in which it is incorporated or formed and pursuant to the charter and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such charter and by-laws (or other formation documents) are amended under the Prepackaged Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Prepackaged Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

F.      **Restructuring Transactions**

On or prior to the Effective Date, the following transactions and the transactions identified in Article V.H of the Prepackaged Plan (the "Restructuring Transactions") shall be effectuated in the following order:

1.      New Organizational Documents.  In accordance with Article V.D of the Prepackaged Plan, on or immediately prior to the Effective Date, the New Organizational Documents shall be adopted as may be necessary to effectuate the transactions contemplated by the Prepackaged Plan.  The Reorganized Debtor will file its New Organizational Documents with the Delaware Secretary of State and/or other applicable authorities in accordance with applicable corporate laws.  The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under Bankruptcy Code § 1123(a)(6).  After the Effective Date, the Reorganized Debtor may amend and restate its New Organizational Documents and other constituent documents as permitted by the terms thereof and applicable law.

2.      SPA Closing.  Subject to and in accordance with the terms and conditions of the SPA, the closing on the SPA shall occur.  210 shall wire the SPA Purchase Consideration to the Reorganized Debtor and the Reorganized Debtor shall immediately take all actions necessary to effectuate the transfer of the SPA Common Stock to 210, including by

delivering irrevocable instructions to AST instructing AST to deliver a stock certificate to 210 evidencing the purchased SPA Common Stock. All of the SPA Common Stock issued pursuant to the SPA and the Prepackaged Plan shall be duly authorized, validly issued, fully paid, and nonassessable, and shall be subject to the terms and conditions of the Reorganized Debtor's Organizational Documents as amended, modified, or altered by the Prepackaged Plan or Confirmation Order.

3. <u>Langley Lease Assignment</u>. The Debtor shall assume and assign the Braker Facility Lease to Langley in accordance with Article VI.B.2 of the Prepackaged Plan.

4. <u>Ascolese Settlement Options</u>. Mark Ascolese will receive the Ascolese Settlement Options as more fully described in Article IX.C of the Prepackaged Plan.

5. <u>Execution of Loan Agreement</u>. The Reorganized Debtor and 210 shall execute the Loan Agreement, any other applicable Loan Documents, and any related agreements without the need for any further corporate or other organizational action and without further action by or approval of the Bankruptcy Court.

6. <u>Execution of SPA Ancillary Documents</u>. The Reorganized Debtor and 210, as applicable, shall execute the remaining SPA Ancillary Documents for which the necessary conditions as provided in the SPA, the Prepackaged Plan, and Confirmation Order shall have occurred.

7. <u>Director and Officer Changes</u>. The actions identified in Article V.H of the Prepackaged Plan shall be implemented in the order identified therein.

## G. Sources of Cash for Prepackaged Plan Distributions

All Cash necessary for the Reorganized Debtor to make Distributions under the Prepackaged Plan shall be obtained from the Debtor's existing Cash balances, the SPA Purchase Consideration, or the liquidation of property of the Estate.

## H. Directors and Officers of the Reorganized Debtor

1. On the Effective Date, all of the Debtor's then-existing directors, except for the Continuing Directors, shall voluntarily resign. The Continuing Directors shall continue on the board of directors of the Reorganized Debtor as Class II directors.

2. On the Effective Date, the 210 Designees shall be designated to the board of directors of the Reorganized Debtor as Class I directors and Stephen Clearman shall be appointed as a special observer of the Reorganized Debtor's board of directors with the right to notice of and the right to attend meetings of the board of directors of the Reorganized Debtor, but without any voting rights at any such meeting. The 210 Designees shall stand for re-election to the Reorganized Debtor's board of directors in 2018 at the Reorganized Debtor's annual meeting of shareholders.

3. On the Effective Date, the 210 Designees shall nominate a fifth director, which director shall be an "Independent" director as defined by the NASDAQ, and the 210

Designees and the Continuing Directors shall hold a vote with respect to the approval of such independent director as the fifth member of the Reorganized Debtor's board of directors. The independent director shall stand for re-election to the Reorganized Debtor's board of directors in 2018 at the Reorganized Debtor's annual meeting of shareholders.

4.       On the Effective Date, the Continuing Officers shall continue as the Reorganized Debtor's chief executive officer and chief financial officer respectively.

5.       On the Effective Date, Jay Powers shall receive the settlement consideration as more fully described in Article IX.D of the Prepackaged Plan.

## I.       Disclosure of Directors and Officers

Pursuant to Bankruptcy Code § 1129(a)(5), the identity and affiliations of any person designated to serve on the initial board of directors of the Reorganized Debtor or as an officer of the Reorganized Debtor will be disclosed in the Plan Supplement. To the extent such person is an insider, the nature of any compensation payable to such person will also be included in the Plan Supplement.

## J.       D&O Liability Insurance Policies

The Debtor or the Reorganized Debtor, as the case may be, shall purchase and maintain director and officer liability insurance coverage for officers and directors of the Reorganized Debtor, including reasonably sufficient tail coverage (i.e., directors' and officers' insurance coverage that extends beyond the end of the policy period) for any director and officer liability policies in effect on the Petition Date for the Debtor's current and former directors, officers, and managers for such terms or periods of time, to be reasonable under the circumstances. All such policies shall be acceptable to 210 and the 210 Directors in all respects.

## K.       New Indemnification Agreements

The Reorganized Debtor shall enter into indemnification agreements, in a form and substance satisfactory to the directors of the Reorganized Debtor, with each of the directors of the Reorganized Debtor, including the 210 Directors, in the form to be included in the Plan Supplement.

## L.       Derivative Litigation Claims

Claims or Rights of Action derivative of or from the Debtor are Estate property under Bankruptcy Code § 541. On and after the Effective Date, all such Derivative Litigation Claims, regardless of whether pending on the Petition Date, will be retained by, vest in, and/or become property of the Reorganized Debtor. All named plaintiffs (including certified and uncertified classes of plaintiffs) in any actions pending on the Effective Date relating to any Derivative Litigation Claims and their respective servants, agents, attorneys, and representatives shall, on and after the Effective Date, be permanently enjoined, stayed, and restrained from pursuing or prosecuting any Derivative Litigation Claim.

## ARTICLE VIII
## Treatment of Executory Contracts and Unexpired Leases

**A.     Assumption and Rejection of Executory Contracts and Unexpired Leases**

**1.     Assumed Executory Contracts and Unexpired Leases**

Except as otherwise specifically provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Prepackaged Plan, as of the Effective Date, the Reorganized Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which the Reorganized Debtor is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) was previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date, (iv) is the subject of a motion to assume and assign on or before the Confirmation Date, or (v) is a Rejected Executory Contract as set forth on **Exhibit E** of the Plan or otherwise included in the Plan Supplement.

Unless otherwise specified, each Executory Contract and Unexpired Lease shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on **Exhibit E or F** of the Prepackaged Plan or otherwise included in the Plan Supplement.

At any time prior to the Effective Date, the Debtor, with the consent of 210, may determine to include or exclude any Executory Contract or Unexpired Lease from the list of Rejected Executory Contracts set forth on **Exhibit E** of the Prepackaged Plan hereto or otherwise included in the Plan Supplement.  The Debtor or Reorganized Debtor, as applicable, shall notify the non-Debtor party or parties to such Executory Contracts or Unexpired Leases by written notice as soon as practicable after such determination.

**2.     Assumption and Assignment of the Braker Facility Lease**

To the extent not already authorized and/or implemented by an Order of the Bankruptcy Court, the Debtor shall assume and assign the Braker Facility Lease to Langley.

**3.     Rejection of Certain Executory Contracts and Unexpired Leases**

All Rejected Executory Contracts shall be rejected as of the Confirmation Date (which rejection shall be effective on the Effective Date), and such Rejected Executory Contracts shall no longer represent the binding obligations of the Reorganized Debtor after the Effective Date. Entry of the Confirmation Order shall constitute approval of such rejections under Bankruptcy Code §§ 365 and 1123.

**B.     Proposed Cure Claim Amounts**

The Proposed Cure Claim Disclosure contains the Proposed Cure Amount for each Assumed Executory Contract.

1. **Objections to Proposed Cure Claim Amounts**

Any objection to a Proposed Cure Claim Amount must be filed with the Bankruptcy Court, and a copy served on the Debtors, on or before the Proposed Cure Claim Objection Deadline.

2. **Failure to Object to a Proposed Cure Claim Amount**

If the non-Debtor party to an Assumed Executory Contract does not file an objection to the Proposed Cure Claim Amount related to such Assumed Executory Contract, the Proposed Cure Claim Amount will be deemed the Allowed Amount of the Cure Claim related to such Assumed Executory Contract.

3. **Resolution of Objection to Proposed Cure Claim Amount**

If an objection is filed to a Proposed Cure Claim Amount by the Proposed Cure Claim Objection Deadline, the Allowed Amount of the Cure Claim related to such Assumed Executory Contract shall be determined by agreement of the parties to such Assumed Executory Contract or by subsequent order of the Bankruptcy Court.

4. **Deemed Assumption Subject to Revocation**

At the option of the Reorganized Debtor, an Assumed Executory Contract for which the associated Proposed Cure Claim Amount is subject to an objection will be deemed assumed by the Reorganized Debtor effective on the Effective Date; provided, however, the Reorganized Debtor may revoke an assumption of any such Executory Contract or Unexpired Lease within twenty (20) days after the later of (i) the Effective Date, or (ii) entry of an order by the Bankruptcy Court adjudicating the objection to the Proposed Cure Claim Amount related to such Executory Contract or Unexpired Lease, by filing a notice of such revocation with the Bankruptcy Court and serving a copy on the party(ies) whose Executory Contract or Unexpired Lease is rejected. Any Executory Contract or Unexpired Lease identified in such revocation notice shall be deemed rejected retroactively on the Effective Date. Any party whose Executory Contract or Unexpired Lease is rejected pursuant to a revocation notice may file a claim arising out of such rejection within thirty (30) days after such revocation notice is filed with the Bankruptcy Court, and any such rejection claim not filed by that deadline shall be discharged and forever barred. The Reorganized Debtor shall have the right to object to any such rejection claim.

5. **Payment of Cure Claims**

Within ten (10) Business Days after the Effective Date, the Reorganized Debtor shall pay all Allowed Cure Claims that are not subject to an objection. The Reorganized Debtor shall pay all Cure Claims that are subject to an objection within twenty (20) days of the later of the (a) Effective Date, and (b) the Allowance Date.

## C.  Rejection Damages Bar Date

Except as otherwise provided for in an order of the Bankruptcy Court, any Claim arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Confirmation Order or prior order of the Bankruptcy Court must be filed with the Bankruptcy Court on or before the Rejection Claim Bar Date, and shall be served on counsel for the Reorganized Debtors. Any such Claims not filed by the Rejection Claim Bar Date shall be discharged and forever barred. Each Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be treated as an Allowed General Unsecured Claim. The Bankruptcy Court shall determine the amount, if any, of the Claim of any Entity seeking damages because of the rejection of any Executory Contract or Unexpired Lease.

## D.  Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any Exhibit to the Prepackaged Plan, nor anything contained in the Prepackaged Plan, will constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability under such Executory Contract or Unexpired Lease. Nothing in the Prepackaged Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Rights of Action, or other rights of the Debtor or the Reorganized Debtor under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease. Nothing in the Prepackaged Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.

## E.  Dispute Regarding Executory Nature of Contracts

If there is a dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease at the time of assumption or rejection, then the Reorganized Debtor will have thirty (30) days following entry of a Final Order resolving such dispute to amend their decision to assume or reject such contract or lease.

## F.  Post-Petition Contracts and Leases

Subsequent to the Petition Date, the Debtor shall not enter any contracts, agreements or leases without the consent of 210. Any such contract, agreement or lease entered into pursuant to the terms of Article VI.F of the Prepackaged Plan shall be deemed assigned by the Debtor to the Reorganized Debtor, as applicable, on the Effective Date, and may be performed by the Reorganized Debtor in the ordinary course of business.

## ARTICLE IX
## Settlement, Release, Injunction and Related Provisions

## A.  Comprehensive Settlement of Claims and Controversies

As set forth herein, the Prepackaged Plan embodies an overall negotiated settlement of numerous Claims and issues pursuant to Bankruptcy Code § 1123 and Bankruptcy Rule 9019

and in consideration for the distributions and other benefits provided under the Prepackaged Plan. Except with respect to the Causes of Action retained pursuant to Article X of the Prepackaged Plan the provisions of the Prepackaged Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest against the Debtor or any distribution to be made pursuant to the Prepackaged Plan on account of any Allowed Claim or Allowed Interest against the Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests (x) of the Debtor, the Reorganized Debtor and the Estate and property, and (y) Claim and Interest holders, and are fair, equitable and reasonable.

## B.     Settlement of Claims with Legacy Purchaser

As provided in the Langley RSA, pursuant to Bankruptcy Code § 1123 and Bankruptcy Rule 9019 and in consideration for the agreement by Legacy Purchaser to (i) accept an assignment of the Braker Facility Lease, and (ii) release the Debtor and Reorganized Debtor from all Claims relating to (a) the November 2016 Sale Transaction, (b) the November 2016 APA, (c) the Braker Facility Lease, and (d) the Stonehollow Lease Assignment, on the Effective Date the Reorganized Debtor shall make a Distribution to Legacy Purchaser in the amount of $1 million less the Debtor's security deposit relating to the Braker Facility Lease.

## C.     Settlement of Claims with Mark Ascolese

The Debtor's CEO, Mark Ascolese, has agreed to accept the Ascolese Settlement Options on the Effective Date in full and final satisfaction, settlement, and release of any and all claims he holds, or may hold, against the Debtor for unpaid compensation or restricted stock units through the Effective Date.

## D.     Settlement of Claims with Jay Powers

The Debtor's CFO, Jay Powers, has agreed to accept a $30,000 cash payment to be paid on the Effective Date in full and final satisfaction, settlement, and release of any and all claims he holds, or may hold, against the Debtor for unpaid compensation through the Effective Date.

## E.     Indemnities

Notwithstanding anything to the contrary herein, any and all obligations of the Debtor to indemnify and hold harmless their current and former directors, officers, agents and employees, whether arising under the Debtor's constituent documents, contract, law or equity, shall be assumed by, and assigned to, the Reorganized Debtor upon the occurrence of the Effective Date with the same effect as though such obligations constituted Executory Contracts that are assumed (or assumed and assigned, as applicable) under Bankruptcy Code § 365, and all such obligations shall be fully enforceable on their terms from and after the Effective Date.

## F. Exculpation

The Debtor, 210, and any of their respective current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (but solely in their capacity as such) shall not have or incur any liability to any Holder of a Claim or Interest, for any act, event, or omission from the Petition Date to the Effective Date in connection with or arising out of the Chapter 11 Case, the confirmation of the Prepackaged Plan, the consummation of the Prepackaged Plan, the administration of the Prepackaged Plan or the assets and property to be distributed pursuant to the Prepackaged Plan, unless such Entity's action is determined as (i) bad faith; (ii) actual fraud; (iii) willful misconduct; or (iv) gross negligence by a Final Order of a court of competent jurisdiction. Each Entity may reasonably rely upon the opinions of counsel, certified public accountants, and other experts or professionals employed by such Entity.

## G. Release of Protected Parties

Except as otherwise specifically provided in the Prepackaged Plan or the Confirmation Order, as of the Effective Date, in consideration of the Distributions, reinstatement, or other treatment under the Prepackaged Plan, Holders of Claims and Interests, for themselves and on behalf of their respective successors and assigns, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Protected Party from any and all claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, including any derivative claims asserted or that could be asserted on behalf of the Reorganized Debtor or its Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected, matured or unmatured, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, that such Holder ever had, now has or hereafter can, shall or may have, or otherwise would have been legally entitled to assert (whether individually or collectively or directly or derivatively), against any Protected Party arising from or relating to, directly or indirectly, in whole or in part, the Debtor, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements among the Holder and the Debtor or the Reorganized Debtor, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Prepackaged Plan Documents, or any other act or omission, transaction, agreement, event, or other occurrence, including the management and operation of the Debtor, taking place on or before the Effective Date.

## H. 210 Release

As of the Effective Date, for good and valuable consideration, the Debtor and Reorganized Debtor will be deemed to release and forever waive and discharge claims, interests, obligations, rights, suits, damages, losses, costs and expenses, actions, causes of action, remedies, and liabilities of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, suspected or unsuspected,

matured or unmatured, fixed or contingent, existing or hereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Prepackaged Plan or the Disclosure Statement, or any prepetition claim that could have been asserted by or on behalf of the Debtor or its Estate or the Reorganized Debtor against 210, and any of its respective current and former affiliates, officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (but solely in their capacity as such), including, but not limited to, all Avoidance Actions; provided, however, that 210 shall not be released under this subsection for any claim or cause of action arising as a result of 210's (i) bad faith; (ii) actual fraud; (iii) willful misconduct; or (iv) gross negligence, each as determined by a Final Order of a court of competent jurisdiction.**

## I.  Discharge and Discharge Injunction

Except as otherwise provided in the Prepackaged Plan, the rights granted in the Prepackaged Plan and the treatment of all Claims and Interests shall be in exchange for, and in complete satisfaction, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtor, the Reorganized Debtor, and any of the Estate property, whether such Claims or Interests arose before or during the Chapter 11 Case or in connection with implementation of the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan, on the Effective Date, each of the Debtor and the Reorganized Debtor shall be discharged and released from any and all Claims and Interests, including demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), regardless of whether (i) a Proof of Claim evidencing such debt was filed or deemed filed under Bankruptcy Code § 501; (ii) a Claim based on such debt is allowed under Bankruptcy Code § 502; or (iii) the Holder of a Claim based on such debt has accepted the Prepackaged Plan.  Except as otherwise provided in the Prepackaged Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.  Pursuant to Bankruptcy Code § 524 and any other applicable section of the Bankruptcy Code, the discharge granted under this section shall void any judgment against the Debtor at any time obtained (to the extent it relates to a discharged Claim or Interest), and operates as an injunction against the prosecution of any action against the Reorganized Debtor or the Estate property (to the extent it relates to a discharged Claim or Interest).

## J.  Enjoining Holders of Claims Against and Interests in Debtor

Except as otherwise expressly provided in the Prepackaged Plan, after the Effective Date, all Entities who have been, are, or may be Holders of Claims against or Interests in the Debtor arising on or before the Effective Date shall be enjoined from taking any of the following actions against or affecting the Debtor, the Reorganized Debtor, its Estate, and Estate property in regard of such Claims or Interests (other than actions brought to enforce any rights or obligations under the Prepackaged Plan) to the fullest extent provided under Bankruptcy Code § 524 or any other applicable section of the Bankruptcy Code:

1.      commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind against the Reorganized Debtor, the Debtor,

its Estate, or Estate property (including, all suits, actions, and proceedings that are pending on the Effective Date, which shall be deemed withdrawn and dismissed with prejudice);

2.      enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree, or order against the Reorganized Debtor, the Debtor, its Estate, or Estate property;

3.      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien against the Reorganized Debtor, the Debtor, its Estate, or Estate property;

4.      asserting any right of subrogation, setoff, or recoupment of any kind, directly or indirectly, against any obligation due the Reorganized Debtor, the Debtor its Estate, or Estate property; and

5.      proceeding in any manner and in any place whatsoever that does not conform to or comply with the provisions of the Prepackaged Plan.

## K.      Integral to the Plan

Each of the discharges and injunctions provided in Article X of the Prepackaged Plan is an integral part of the Prepackaged Plan and is essential to its implementation. Each of the Protected Parties and any other parties protected by the releases and exculpations set forth in Article X of the Prepackaged Plan shall have the right to independently seek the enforcement of the releases and exculpations set forth Article X of the Prepackaged Plan.

## ARTICLE X
## Retention of Rights of Action

### A.      Reorganized Debtor's Preservation, Retention and Maintenance of Rights of Action

Except as otherwise provided in the Prepackaged Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Prepackaged Plan, in accordance with Bankruptcy Code § 1123(b)(3), the Reorganized Debtor shall retain and shall have the exclusive right, authority, and discretion to (without further order of the Court) determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw, or litigate to judgment any and all Rights of Action that the Debtor or the Estate may hold against any Entity, whether arising before or after the Petition Date. The Debtor reserves and shall retain the foregoing Rights of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case.

### B.      Preservation of All Rights of Action Not Expressly Settled or Released

Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in the Prepackaged Plan or any Final Order, the Debtor expressly reserves such Right of Action (including any counterclaims) for later adjudication by the Reorganized Debtor. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral, estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches

shall apply to such Rights of Action (including counterclaims) on or after the Confirmation of the Prepackaged Plan.

## ARTICLE XI
### Financial Projections, Feasibility and Risks

### A.      Financial Projections and Feasibility

The Debtor has analyzed its ability to meet its obligations under the Prepackaged Plan and it believes that it will be able to make all payments required under the Prepackaged Plan. The Debtor further believes that confirmation of the Prepackaged Plan is not likely to be followed by a liquidation or need for further restructuring.

Creditors and other interested parties should see the below "Other Risks Related to the Debtor's and Reorganized Debtor's Business" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

### B.      Risks Associated with the Plan

Both the confirmation and consummation of the Prepackaged Plan are subject to a number of risks. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Plan and its implementation. Specifically, there are certain risks inherent in the reorganization process under the Bankruptcy Code. If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Prepackaged Plan even if the Holders of Claims and Interests entitled to vote accept the Plan or are deemed to except the Plan. Although the Debtor believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor to solicit acceptances, which could delay and/or jeopardize confirmation of the Prepackaged Plan. The Debtor believes that Bankruptcy Court will confirm the Prepackaged Plan. The Debtor, however, cannot assure that modifications of the Prepackaged Plan will not be required to obtain confirmation of the Prepackaged Plan, or that such modifications will not require a solicitation of acceptances. If the Prepackaged Plan is not confirmed in a timely manner, it is unclear whether the restructuring of the Debtor's indebtedness contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Moreover, nonconfirmation of the Prepackaged Plan could result in an extended Chapter 11 proceeding, which could have a negative effect on the Debtor's business operations.

Even if the Prepackaged Plan is confirmed, the Debtor will continue to face a number risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, or a change of control event negatively impacting their Tax Attributes. Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**C.      Other Risks Related to the Debtor's and Reorganized Debtor's Business**

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following, among others: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Prepackaged Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Case from time to time; (c) ability to maintain relationships with suppliers and service providers; and (d) ability to maintain contracts that are critical to the Debtor's operations. These risks and uncertainties could affect the Debtor's business and operations in various ways. In addition, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case that may be inconsistent with the Debtor's plans.

## ARTICLE XII
## Alternatives to Plan and Liquidation Analysis

There are three possible consequences if the Prepackaged Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Chapter 11 Case, (b) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by some other party.

**A.      Dismissal**

If the Chapter 11 Case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal could force a race among creditors to take over and dispose of the Debtor's available assets. Even the most diligent unsecured creditors might fail to realize any significant recovery on their claims.

**B.      Chapter 7 Liquidation**

A straight liquidation bankruptcy, or chapter 7 case, requires liquidation of the bankruptcy debtor's assets by an impartial trustee. In a chapter 7 case, the amount unsecured creditors and shareholders receive (if any) depends on the net assets available after all assets of the debtor have been reduced to cash. The cash realized from liquidation of the debtor's assets would be distributed to creditors and other stakeholders in accordance with the order of distribution prescribed in Bankruptcy Code § 507.

If the Prepackaged Plan is not confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be appointed to liquidate the Debtor's assets for distribution to creditors and other stakeholders in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under chapter 7 or Chapter 11, Secured Claims, Administrative Claims, Priority Unsecured Non-Tax Claims, and

Priority Unsecured Tax Claims are entitled to be paid in full before unsecured creditors receive any funds. All creditors must be paid in full before shareholders are entitled to receive any distribution.

If the Chapter 11 Case is converted to a case under chapter 7, the present Administrative Claims may have a priority lower than priority claims generated by the respective chapter 7 case, such as the chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

If the Chapter 11 Case is converted, the Bankruptcy Court would appoint a trustee to liquidate the Debtor's property and assets and distribute the proceeds to creditors and other stakeholders in accordance with the Bankruptcy Code's priority scheme. It is likely that the chapter 7 trustee would have little or no experience or knowledge of the Debtor's business or its records or assets. A substantial period of education would be required in order for any chapter 7 trustee to wind the case up effectively.

The chapter 7 trustee would be entitled to receive the compensation allowed under Bankruptcy Code § 326. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1 million; and reasonable compensation not to exceed 3% of any amount in excess of $1 million, on all funds disbursed or turned over in the bankruptcy case by the trustee to parties in interest (excluding the Debtor, but including the holders of Secured Claims). The trustee's compensation would be paid as a cost of administration of the chapter 7 estate, and may have priority over the costs and expenses incurred in the Chapter 11 Case and any payment to unsecured creditors.

It is also likely that the chapter 7 trustee would retain his own professionals (including attorneys and financial advisors) whose fees would also constitute priority claims in the chapter 7 cases, with a priority that may be higher than those claims arising as part of the administration of the Chapter 11 Case.

The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to the Holders of Claims than the full recovery provided for in the Prepackaged Plan. As previously noted, conversion to chapter 7 would give rise to (a) additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In a chapter 7 liquidation, it is very possible that general unsecured creditors would receive greatly diminished recovery on their claims and that shareholders would not receive any distribution on account of their Interests in the Debtor.

## C.     Alternative Plan

Because the Debtor has filed the Prepackaged Plan and seeks its confirmation during the exclusive period established under the Bankruptcy Code, no other alternative plans can be proposed at this time. Nonetheless, even if an alternative plan were proposed, it would likely

propose a sale of assets and a liquidation of the Debtor and the distribution of resulting Cash to the Holders of Claims, or an internal restructuring similar to that contemplated in the Prepackaged Plan. In comparison to the Prepackaged Plan, such an alternative plan would likely not provide any greater return to Creditors and Interest Holders and any return could be even less, due to the additional time and expense necessary to obtain approval of an alternative plan.

## ARTICLE XIII
### Certain United States Federal Income Tax
### Consequences of the Prepackaged Plan

The following discussion summarizes certain material U.S. federal income tax consequences of the Prepackaged Plan relevant to the Debtor, Creditors and Interest holders. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations thereunder, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement. Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The material U.S. federal income tax consequences of the Prepackaged Plan are complex and subject to uncertainties. The Debtor has not requested a ruling from the IRS or an opinion with respect to any of the tax aspects of the Prepackaged Plan. There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences. In addition, this summary does not address state, local, or foreign tax consequences of the Prepackaged Plan, and it does not purport to address the federal income tax consequences of the Prepackaged Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass through entities).

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CREDITOR. ALL CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM UNDER THE PREPACKAGED PLAN.**

### A.    Federal Income Tax Consequences to Debtors

Under the Prepackaged Plan, the Debtor will satisfy Claims by making payments and transferring property to certain of its Creditors directly. Because none of the Claims are impaired or are being paid at a discount, other than certain compensation claims held by officers of the Debtor, the Debtor should not realize any "discharge of indebtedness" income as a result of closing the Prepackaged Plan. With regard to the officers' compensation claims, to the extent they are satisfied at a discount they will not cause the Debtor to realize any "discharge of indebtedness" income because they are claims that, if paid in full, would give rise to a deduction.

The Debtor also has substantial Tax Attributes (the NOLs and Tax Attributes described above), the Debtor's use of which could become subject to severe limitations under Sections 382 and 383 of the Code in the event there is an "ownership change" of the Debtor as defined in Section 382 of the Code. Generally, an "ownership change" occurs if the percentage (by value) of the stock of a corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change. The Debtor anticipates that the issuance of common stock to 210 pursuant to the SPA and the Prepackaged Plan will cause the Debtor to have an "ownership change." However, there is an exception in Section 382(l)(5) of the Code which provides that an "ownership change" of a debtor corporation occurring under the jurisdiction of a bankruptcy court in a title 11 case will not cause the debtor's tax attributes to be limited under Sections 382 or 383 of the Code if the shareholders and certain qualified creditors of the debtor corporation (determined immediately before such "ownership change") own (after such "ownership change" and as a result of being shareholders or creditors immediately before such change) at least 50% of the stock of the debtor corporation. The Debtor believes that it will be eligible for this bankruptcy exception under Section 382(l)(5) of the Code and that as a result, its Tax Attributes will not be limited because of the "ownership change" occurring as a result of the closing of the Prepackaged Plan. However, because the Debtor will rely on this bankruptcy exception, its then-remaining NOLs and Tax Credits will be reduced to zero if it undergoes another "ownership change" within two years after the effective date of the Prepackaged Plan. The provisions of the Charter Amendment that restrict future buying and selling of the Debtor's common stock are intended to minimize the possibility that such a second "ownership change" might occur.

## B.      Federal Income Tax Consequences to Creditors

### 1.      In General

Because Creditors generally are not Impaired and are not being paid at a discount, and will receive payments with respect to their Claims pursuant to their existing terms and conditions, the tax consequences to a Creditor of receiving payments with respect to its Claims generally will be the same as if the payments were made outside of bankruptcy.

### 2.      Backup Withholding and Information Reporting

Under the Code, interest and other "reportable payments" received by a Creditor may, under certain circumstances, be subject to "backup withholding" at a rate of 28%. Withholding generally applies if the payee: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.

**C.    Federal Income Tax Consequences to Interest Holders**

Under the Prepackaged Plan, the Interest Holders are retaining their Interests and are not exchanging them for any cash or property.  As a result, the Interest Holders will not realize any taxable income or loss from the closing of the Prepackaged Plan

**ARTICLE XIV**
**Conclusion**

This Disclosure Statement provides information regarding the Debtor's Chapter 11 Case and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Prepackaged Plan as proposed.  The Prepackaged Plan is the result of efforts by the Debtor to pay all holders of Allowed Claims in the ordinary course of business while restructuring the Debtor's obligations.  The Debtor believes that the Prepackaged Plan is feasible and will provide each holder of a Claim against and Interest in the Debtor with an opportunity to receive greater benefits than those that would be received by any other alternative.

*[Signature Page Follows]*

Dated: March 22, 2017

**P10 INDUSTRIES, INC.**

/s/ Mark A. Ascolese
_____
By:    Mark A. Ascolese
Its:    CEO

**EXHIBIT 1**

**PREPACKAGED PLAN OF REORGANIZATION FOR P10 INDUSTRIES, INC.
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**EXHIBIT 2**

**210 RESTRUCTURING SUPPORT AGREEMENT**

**EXHIBIT 3**

**LANGLEY RESTRUCTURING SUPPORT AGREEMENT**

**EXHIBIT 4**

**10-K**

**EXHIBIT 5**

**LIST OF PATENTS**